UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIL EDWARD STONE, ) | 1:08-CV-00141-JMD-HC |
| ) | |
| Petitioner, ) | ORDER DENYING PETITION FOR WRIT |
| ) | OF HABEAS CORPUS WITH PREJUDICE |
| v. ) | |
| ) | ORDER DIRECTING CLERK TO ENTER |
| CALIFORNIA DEPARTMENT OF ) | JUDGMENT |
| CORRECTIONS, ) | |
| ) | ORDER DECLINING TO ISSUE |
| Respondent. ) | CERTIFICATE OF APPEALABILITY |
| _____) | |

Petitioner Neil Edward Stone ("Petitioner") is proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**Procedural History**

On March 14, 2005, a jury convicted Petitioner of felony murder, robbery, and first degree burglary. (Pet. at 3). The jury found true the special allegation that Petitioner personally used a firearm in the commission of the offense. (Id.). The jury also convicted Petitioner of misdemeanor destruction of evidence. (Id.).

Petitioner filed a timely appeal of his conviction. The California Court of Appeal affirmed Petitioner's conviction in an unpublished decision entered on October 12, 2006. (Lod. Doc. 4). Petitioner filed a petition for review before the California Supreme Court, which was denied on December 20, 2006. (Lod. Doc. 6).

///

On October 19, 2007, Petitioner filed a petition for writ of habeas corpus in the Tulare County Superior Court. (Lod. Doc. 8). The Superior Court denied the petition on October 22, 2007. (Lod. Doc. 9). Petitioner then filed a habeas petition in the California Court of Appeal on November 8, 2007, which was summarily denied on February 11, 2008.

Petitioner filed the instant petition for writ of habeas corpus in the United States District Court for the Eastern District of California on January 28, 2008. (Doc. 1). Petitioner filed an amended petition on June 2, 2008. (Doc. 10). The Court ordered Respondent to file responsive pleading on June 12, 2008, and Respondent filed an answer to the petition on October 9, 2008. (Doc. 20). Petitioner filed a traverse on October 27, 2008. (Doc. 21; 22).

**Consent to Magistrate Jurisdiction**

On February 8, 2008, Petitioner consented to have a United States Magistrate Judge conduct all proceedings in this case, including trial and entry of final judgment, pursuant to 28 U.S.C. § 636(c)(1). (Doc. 5). Respondent consented to Magistrate jurisdiction on July 18, 2008. (Doc. 14).

## Factual Background

Petitioner contends that his conviction is tainted by the trial court's admission of involuntary confessions into evidence. Accordingly, the factual background relevant to the instant petition concerns the interrogations that produced Petitioner's confessions and the state courts' adjudication of Petitioner's challenge to the admissibility of the confessions. The California Court of Appeals decision affirming Petitioner's conviction contains an apt summary of the relevant facts:

> At 5:04 p.m. on May 2, 2003, Detective Hunt obtained a waiver of rights under Miranda v. Arizona (1966) 384 U.S. 436, 16 L. Ed. 2d 694 and interviewed appellant at the Violent Crimes Office of the Tulare County Sheriff's Department. Appellant said he had heard about the homicide and that Trejo had "a whole fucken shit load" of narcotics buried near his trailer. Appellant said he and Patricia Valenzuela babysat for his wife on April 14 and then, late that evening, his wife drove them to see Dana Wilson at the Edge Water Inn. Antonio Corrales came over and then left. Appellant and Valenzuela smoked some marijuana and fell asleep. When they awakened, Corrales gave them a ride to appellant's mother's home in Reedley. They stayed at his mother's home that whole day.
>
> Appellant initially told Detective Hunt he did not know anything about the homicide. He claimed he had never been in a real fight in his life, although he acknowledged "[p]eople talk a lot of shit on me like fucking like they all think that I rob stores and fucken murder people and this and that." Appellant said he had known Antonio Corrales for six months and had seen him seven or eight times during that period. When Detective Hunt asked about Robert Trejo, appellant first said, "Dana was

suppose to go out there and do a dance that freaken Tony [Antonio Corrales] had set up." Upon further questioning, appellant said he, Valenzuela, and Wilson had gone to Trejo's and "scored some shit" before appellant babysat for his wife. Appellant said they scored $ 20 worth of crank between 5:00 and 6:00 p.m. and smoked the drug in some orchards near Corrales's house.

After appellant explained that visit to Trejo's place, Detective Hunt said, " Neal the here's the deal the gig's up, alright. We know what, what happened and what a question coming, is coming down to is who plotted thing out was it you or Tony[?]" Appellant eventually asked, "Well, what did Patty [Valenzuela] say?" Hunt responded by saying, "they've talked," and that the physical evidence matched up. Hunt went on to say, "[I]f you want to convince a judge and jury that you deserve any mercy what so ever in this deal then you, you need to, to tell me some thing's like I didn't mean for this to happened, we didn't mean for this to happened." Appellant ultimately told the detective:

"And it may cost me quite a few years of my life but I just want you to know that Patty fucken she didn't know it was gonna even go that way at all.

"It wasn't suppose to happen like that, it wasn't he wasn't even suppose to die. I mean, Tony freaken came to me that day and asked me to do this. First he wanted me to take a gun and you know it's kind of you know to teach this guy a lesson. You know rough him up a little bit and you know take whatever I wanted but you know it was mainly fucken, cause he said it was his uncle. That was his uncle and his uncle was freaken taking money from you know, it was suppose to be like their in a family drug dealing business and whatever. And he was suppose to be sending money to his [Corrales's] mom but he wasn't.

"So fucken you know they find out when they got a hold of her or something and they wanted him to be dealt with and so that's why Tony came to me. And he wasn't suppose to die, he wasn't suppose to die that fucken honest god truth I swear to God. I mean I wasn't suppose to go in there and freaken kill him but I mean he was fighting and then fucken he was going into that cupboard right there where there was a gun. You know and I mean fucken sh he wouldn't freaken let you know I tried to a, I tried to make it seem that Patty wasn't, Dana wasn't involved when I went in there. And fucken, he wouldn't he was like putting a fight he was trying to get to that cupboard you know. And there's gun in there so I mean he would of probably killed both me and Patty but he wasn't suppose to die. You know I mean he stood up and I just know he stood up and freaken that's when I hit him a few more times and that's when he went unconscious. And then Patty and them left and I freaken was looking for freaken you know the key thing that Tony told me to grab which, which had you know shit in it. And that's fucken all and then the girl's weren't there and I freaken took off.

"But I mean that guys got to know fucken Patty and Patty and Dana really didn't fucken know what they were getting into. Their kind of like innocent parties in it really. You know I mean I knew more or less what I was getting into. I fucken didn't mean to kill him but you know I didn't freaken come up, I didn't even know the guy before this."

Appellant told Detective Hunt he had asked Corrales what would happen if he hit Trejo and the latter died. Corrales told appellant it was all right if Trejo died.

Upon further questioning by Detective Hunt, appellant explained the origins of the plan leading to Trejo's death. Appellant said Corrales came to his house and "gave me the run down on it." Appellant was open to the plan because he needed money and

had no place to live. Corrales drove appellant, Valenzuela, and Wilson by Trejo's home and then back to appellant's home. When appellant could not find a gun to use, he said "we'll just take a bat." According to appellant, Corrales wanted it to appear that Trejo was harmed because of his involvement with a number of women. Because Wilson wanted some drugs, appellant suggested "let's score it from him." Corrales said he would call Trejo in order to score some drugs from him. They went to a store and Corrales called Trejo from a pay telephone. Valenzuela and Wilson stayed inside the car and Corrales and appellant stood outside the car. Corrales drew a map in the soil to show the location of Trejo's trailer in relation to the road and the surrounding area.

According to appellant, Corrales planned for Valenzuela and Wilson to dance for Trejo and then they would page appellant to enter the trailer once Trejo was on the bed. Appellant dressed in black clothes with black shoes and a black mask. 6 Appellant also came up with the idea of having Valenzuela "tape him up" so that Trejo could not fight back when appellant was ready to hit him. Valenzuela bought some tape at the Sunrise Market. Corrales left appellant at the Sunrise Market, made a call from a pay telephone near the Redwood Inn in Sultana, and then drove the two women to Trejo's place. Corrales returned to the Sunrise Market, picked up appellant, and the two men went back to Trejo's and parked in some rows near the trailer....

On May 5, 2003, Detective Hunt conducted a second videotaped and audiotaped interview with appellant after obtaining his waiver of Miranda rights. Appellant told Hunt that Corrales maneuvered his car when they arrived at Trejo's place so that Corrales's headlights would not be directed toward the trailer. Appellant also said that Corrales took the two women to Trejo's place and left appellant behind at a store near the Redwood Inn. Corrales did not want Trejo to be able to associate appellant with the incident. Once Corrales and appellant arrived at Trejo's trailer, appellant got out of the car and walked toward the trailer through some orange trees. Appellant was dressed in a black hooded shirt, black pants, black shoes, gloves, and a mask. As appellant approached a parked vehicle, a dog began barking. Trejo came outside and appellant hid under the car. When another car drove up, appellant fled on foot through some orange trees and lost his pager. Appellant went back to Corrales, told him about the lost pager, and borrowed Corrales's lighter to look for the pager. Appellant climbed over a fence and saw Valenzuela smoking a cigarette outside the trailer. He walked into the trailer, Valenzuela joined him inside, and the assault commenced. Trejo was naked and Wilson was standing over him and dancing. Appellant told Detective Hunt that Wilson got off of Trejo and appellant hit him about 15 times with the baseball bat, with at least three blows to Trejo's head. Appellant also told Hunt he found the gun in a cupboard near the headboard of Trejo's bed.

Appellant told Hunt he was supposed to look in Trejo's home for a key chain with drugs in it, the victim's cell phone, the victim's pager, money, and a large package of drugs. Appellant had previously discussed these matters with Corrales. While appellant was hitting Trejo with the baseball bat, Dana Wilson got dressed, retrieved a CD that belonged to her, and started looking for the various items. Appellant tossed Wilson a bag and she filled it with items. After appellant hit Trejo a few times, Trejo responded by fighting appellant off with his hands and fists. Trejo stayed on the bed the entire time and was essentially on his knees. Appellant did admit that Trejo started bleeding when he hit him in the head. The blood flowed from the top of his head. Appellant told Hunt he had to back away from Trejo in order to get a better hit at the victim and to prevent the victim was grabbing the bat away. After one particular hit, Trejo started making a snoring sound and fell to the bed. When appellant tapped Trejo's head one more time, it made a hollow sound...

On March 1, 2005, appellant filed a motion to suppress his May 2 and 5, 2003

statements to sheriff's deputies on the grounds they were taken in violation of his rights under Miranda v. Arizona, supra, 384 U.S. 436 and constitutional rights to counsel, to remain silent, and to due process of law. On March 2 and 3, 2005, the court conducted a hearing on the motion pursuant to Evidence Code section 402.... At the Evidence Code section 402 hearing, Detective Hunt testified he was involved in the arrest of appellant in the City of Lemoore at 11: 50 a.m. on May 2, 2003. Hunt said he transported Patricia Valenzuela to the violent crimes office later that day and someone else transported appellant. Hunt conducted an audiotaped and videotaped interview of appellant at 5:05 p.m. that day. Hunt did not have a conversation with appellant prior to the commencement of taping. Appellant first asked how Patricia Valenzuela was doing. One of the first things Hunt told appellant was that "Tony Corrales made a statement saying that it was … all on him, all on Stone." After Hunt asked appellant some booking/vital statistics questions, appellant offered to provide some information in a separate homicide case.

After discussing the unrelated case for a few minutes, Hunt advised appellant of his rights pursuant to Miranda. Hunt said appellant's answers were appropriate, he was cooperative, and he did not appear to be under the influence although he sometimes spoke rapidly. He appeared to understand everything that Hunt was talking about. Hunt said he did not make any promises to or threats against appellant and did not talk to him off of the tape. Hunt was dressed in plain clothes and did not yell at appellant during the one-hour interview. Hunt said he interviewed appellant a second time on May 5, readvised him of his rights under Miranda, and asked whether appellant would agree to cooperate and help finish everything up. Appellant said, "I don't mind at all," gave Hunt another statement, and accompanied Hunt on a tour of different locations involved in the charged offenses.

With respect to the May 2 interview, Hunt said appellant was in custody the entire time and was wearing a jumpsuit during the 5:00 p.m. hour. Hunt said he took about five minutes to gather the general booking information from appellant before advising him of his rights under Miranda. Hunt said appellant had a verbal "yes" to the Miranda advisements but did not get a formal waiver on the record. Appellant was in belly chains and leg irons. On cross-examination, Hunt said he was present when appellant was arrested in Lemoore and was aware that drugs were found at the arrest site. After Hunt returned to the violent crimes unit following the arrests, he interviewed Valenzuela first and had no contact with appellant, although Hunt could see appellant sitting in another office. Hunt eventually interviewed appellant and said Antonio Corrales had placed responsibility for the crimes on appellant. At the Evidence Code section 402 hearing, Hunt testified that Corrales did not actually make this statement. Rather, Dana Wilson and Patricia Valenzuela told law enforcement that appellant was responsible for the crime.

At one point in the interview, Hunt told appellant he needed to convince a judge or jury that he deserved mercy and that he had to explain how Antonio Corrales was behind the offense. Hunt testified that "there was already strong evidence against him and that it would be important and beneficial for him to explain his side of the story." Hunt said he wanted appellant to tell the truth about what happened and gave him examples of things that might be to his benefit. Such "things" included an intent not to kill the victim. However, Hunt said he made no promises or deals with appellant. Hunt specifically said he did not make any promises or deals involving the treatment of Valenzuela.

Former Sheriff's Detective Frank Arnold testified he was involved in the search of the Lemoore residence on May 2, 2003. Arnold said he and then-Detective Mario Martin transported appellant from the residence to the Sheriff's Department Violent Crimes

Office. Arnold said appellant initiated a conversation during that drive. Appellant said his girlfriend, Patty, was suicidal and Arnold later relayed that information to Detective Hunt. Arnold had told appellant he would pass the information along.

Sheriff's Lieutenant Scott Logue testified he was involved in the search of the Lemoore residence and supervised the investigation. Logue saw appellant in a bedroom of the residence but did not ask him any questions. Another officer was involved in transporting appellant to the violent crimes office. Logue said he had no conversations with appellant at the violent crimes office, made no promises to appellant, and prepared no reports on the case. Logue said he was present when appellant was interviewed on videotape and watched the interview through a closed circuit television. Logue did not recall telling appellant he was a murderer or that everybody in the case had confessed. He also did not recall telling him the only way to help Valenzuela was to tell deputies what he had done.

Appellant testified he had spoken with Lieutenant Logue in the hallway of the violent crimes office. They were standing by a barrel near an exit sign. According to appellant, Logue said he was a killer and advised him that everybody confessed in the case. Appellant testified, "[H]e told me if I really loved her [Valenzuela] and I really wanted to help her out and I cared for her, that I needed to be honest and tell him what happened." Appellant said the only time he admitted his conversation with Logue was during a recorded conversation with Valenzuela after his interview with Detective Hunt.

(Lod. Doc. 4 at 9-23).

## Discussion

### I. Jurisdiction and Venue

A person in custody pursuant to the judgment of a state court may file a petition for a writ of habeas corpus in the United States district courts if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a);[1] 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, n.7 (2000). Venue for a habeas corpus petition is proper in the judicial

Petitioner asserts that he is currently incarcerated at Corcoran State Prison in Kings County, California, in violation of his rights under the United States Constitution. As Kings County is within the Eastern District of California, the Court has jurisdiction over the instant petition and venue is proper in the Eastern District. 28 U.S.C. § 84; 28 U.S.C. § 2241(c)(3).

---

[1] The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

**II.  Standard of Review**

Section 2254 "is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126 (9th Cir. 2006) (quoting White v. Lambert, 370 F.3d 1002, 1009-10 (9th Cir. 2004)).  Under section 2254, a petition for habeas corpus may not be granted unless the state court decision denying Petitioner's state habeas petition "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or  "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly...rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (citations omitted).  State court factual findings are presumed correct and may not be set aside absent clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**III.   Analysis**

Petitioner contends that his Fifth Amendment rights were violated due to the fact that during Petitioner's trial, two involuntary confessions made by Petitioner were offered into evidence against him.  In determining whether a defendant's confession was voluntary, the question is "whether the defendant's will was overborne at the time he confessed." United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004) (citations omitted).  A confession must be suppressed, even absent a Miranda violation, when the totality of the circumstances demonstrates that the confession was involuntary. Deweaver v. Runnels, 556 F.3d 995, 1002-03 (9th Cir. 2009) (citing Dickerson v. United States, 530 U.S. 428, 434 (2000)).  The government must prove that a confession  was voluntary by a preponderance of the evidence.  E.g, United States v. Bautista, 362 F.3d 584, 589 (9th Cir. 2004) (citations omitted). Whether a confession was voluntary is a mixed question of law and fact.  See Lambert v. Blodgett, 393 F.3d 943, 976 (9th Cir. 2004) (citing Rupe v. Wood, 93 F.3d 1434, 1444 (9th Cir. 1996)).

///

Thus, while federal habeas courts must review a state court's legal conclusion as to whether a confession was voluntary under the rubric of section 2254(d)(1), the factual findings underlying the state court's conclusion are afforded a presumption of correctness pursuant to section 2254(e)(1). Lambert, 393 F.3d at 976.

Petitioner first confessed to the crime on May 2, 2003. (Pet. at 2). Petitioner confessed again on May 5, 2003. (Pet. at 22). With respect to the May 2 confession, Petitioner claims that (1) he was intoxicated at the time of his confession; and (2) law enforcement engaged in coercive interrogation tactics. With respect to his May 5 confession, Petitioner contends that the sixty-hour interval between his May 2 and May 5 interrogations was insufficient to purge the coercion that tainted Petitioner's May 2 confession.[2] The California Court of Appeal rejected Petitioner's claims in the last reasoned decision issued by the State.[3]

**A. Intoxication**

Petitioner contends that his May 2, 2003 confession was involuntary due to the fact that he was under the influence of narcotics during his interrogation. (Pet. at 6). The California Court of Appeal addressed Petitioner's claim and held that the record did not support Petitioner's assertion that he was impaired:

> Appellant also suggests he was under the influence at the time of the first interview with Detective Hunt on May 2, 2003. When appellant testified at the Evidence Code section 402 hearing, he did not claim to have taken drugs on the day of his arrest. Detective Hunt did not detect any drug use by appellant that day, although Hunt admitted that appellant spoke rapidly. A review of the transcript of the interview reveals that appellant responded appropriately to Hunt's questions, clearly recalled the sequence of events, and answered in substantial detail.

(Lod. Doc. at 26). The record supports the Court of Appeal's finding, and Petitioner points to no reliable evidence to the contrary. The petition states merely that at the time of his confession, Petitioner was "more than *likely* on the downward crash off of meth." (Pet.at 8) (emphasis added). Petitioner's conclusory allegation that he was likely under the influence is insufficient to establish

---

[2] Respondent's contention that Petitioner's claim regarding the May 5 confession is unexhausted lacks merit. The California Court of Appeal clearly addressed both claims: "In our view, the parties' references to 'statement' and 'confession' refer to appellant's combined remarks to sheriff's personnel on May 2 and 5, 2003." (Lod. Doc. 4 at 19).

[3] As Petitioner's state habeas petitions were summarily denied, the Court must "look through" the summary dispositions to the last reasoned decision issued by the state. Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991).

that the California Court of Appeal's finding, that Petitioner was not impaired by drug use at the time of his confession, was incorrect. See 28 U.S.C. § 2254(e)(1) (requiring clear and convincing evidence). (Pet. at 8). Because Petitioner has not met his burden of establishing that the California Court of Appeal's finding was incorrect by clear and convincing evidence, the Court may not disturb the state court's finding of fact. 28 U.S.C. § 2254(e)(1). Accordingly, the Court is precluded from holding that Petitioner's May 2, 2003 confession was involuntary due to the influence of narcotics.

### B. Alleged Coercion

Petitioner avers that law enforcement personnel employed coercive tactics during Petitioner's interrogation on May 2. Petitioner complains that he was humiliated because when he was processed after his arrest, he was photographed in the nude, given a prison jumpsuit, forced to give DNA samples, and was interrogated in a room with no windows. Petitioner cites no authority for the proposition that routine booking procedure, employed prior to the commencement of an interrogation, results in a coerced confession. The California Court of Appeal addressed Petitioner's contention that he was subjected to coercion and rejected it:

> In the instant case, the sheriff's deputies did not yell, threaten, or force appellant to make a taped statement. They did not use physical violence or questionable psychological techniques to compel statements. (See People v. Cahill (1993) 5 Cal.4th 478, 485.) Appellant did not indicate that he was hungry, tired, or ill during the interview. (See People v. Esqueda (1993) 17 Cal.App.4th 1450, 1486.) The interview did not reflect aggressive or confrontational questioning. Although Detective Hunt encouraged appellant to tell the truth, that exhortation did not violate constitutional standards. (People v. Howard (1988) 44 Cal.3d 375, 398, 243 Cal. Rptr. 842.)

(Lod. Doc. 4 at 25-26 ). Petitioner was fully clothed while questioned, was not subjected to physical or psychological abuse, and was advised of his right to remain silent and to consult an attorney before the interrogation began.[4] Where interrogators obtain a confession after delivering Miranda warnings, the confession is likely voluntary. Deweaver, 556 F.3d at 1003.

///

---

[4] Petitioner contends that he was never expressly asked to waive his Fifth Amendment rights. The Supreme Court has never held that a suspect must be asked expressly to waive his rights; waiver depends upon the totality of the circumstances in the particular case. Preciado v. Tilton, 2009 U.S. App. LEXIS 4730 *2-3 (9 th Cir. 2009) (unpublished) (citing Moran v. Burbine, 475 U.S. 412, 421-22(1986) and North Carolina v. Butler, 441 U.S. 369(1979)). Accordingly, Petitioner's contention does not implicate clearly established federal law as established by the decisions of the United States Supreme Court and is therefore not grounds for relief under section 2254. 28 U.S.C. § 2254(d)(1).

Petitioner also complains that his interrogators lied to him during his interrogation, and that such deception amounted to coercion. "Trickery [and] deceit...do not render a confession inadmissible...unless government agents make threats or promises." Id. (quoting United States v. Kontny, 238 F.3d 815, 817 (7th Cir. 2001)); see also Frazier v. Cupp, 394 U.S. 731, 739 (1969) (police misrepresentation, while relevant, is insufficient to make an otherwise voluntary confession inadmissible). The California Court of Appeal addressed Petitioner's contention and rejected it:

> Appellant nevertheless maintains Detective Hunt lied during the interview by saying that Corrales, rather than Wilson and Valenzuela, had implicated him in the offenses. Good faith confrontation with the confessions of other accomplices is an interrogation technique possessing no apparent constitutional vice. (People v. Robinson (1969) 274 Cal. App. 2d 514, 520-521, 79 Cal. Rptr. 213.) Even if we assume that Hunt engaged in deception rather than misrecollection here, a law enforcement officer's deception regarding the evidence is permissible if it is not of a type reasonably likely to procure an untrue statement. (People v. Jones (1998) 17 Cal.4th 279, 299.) Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession but they are per se insufficient to make it involuntary. Rather, there must be a proximate causal connection between the deception or subterfuge and the confession. (People v. Musselwhite (1998) 17 Cal.4th 1216, 1240.) In the instant case, Hunt's statement about Corrales did not proximately cause appellant to confess. At the interview, appellant said he was confessing in part in order to exculpate his girlfriend, Patricia Valenzuela, and also sought to place criminal responsibility upon Antonio Corrales, the individual who gave appellant "the run down on it."

(Lod. Doc. 4 at 25-26). As noted by the California Court of Appeal, Petitioner did not establish conclusively that he was lied to in bad faith by his interrogators. Further, Petitioner has not met his burden of establishing that the California Court of Appeal's determination, that any alleged deception was the not proximate cause of his confession, was incorrect. The Court of Appeal's conclusion that Petitioner confessed in order to exculpate his girlfriend is supported by the record and reflects a reasonable determination of the facts. Accordingly, the Court may not disturb the state court's finding that, even if Petitioner was lied to, such deception was not the proximate cause of his confession.

Finally, Petitioner contends that he was offered an "implied promise" of leniency. (Pet. at 16). The California Court of Appeal rejected Petitioner's claim:

> [T]he deputies did not make promises of leniency in exchange for an inculpatory statement. Detective Hunt did indicate that appellant should tell the truth if he expected any mercy from the courts. Hunt also told appellant that Valenzuela and Wilson had identified the "master mind" and wanted to give appellant an opportunity to "make sure that your story matches up with the truth. Cause there gonna be one

> story out of place." The sheriff's deputies did not suggest that a truthful statement would preclude criminal prosecution or result in a lesser sentence or leniency. A statement that a truthful statement will be advantageous is permissible. (People v. Vasila (1995) 38 Cal.App.4th 865, 874.) Moreover, federal courts have held that it is not improperly coercive conduct for an officer to tell a suspect that the prosecutor will be informed of his cooperation and will evaluate his case in light of his cooperation. Such conduct by an officer does not transform a defendant's otherwise voluntary statement into an involuntary one. The police are allowed to play on a suspect's ignorance, anxieties, fears, and uncertainties. Officers are just not allowed to magnify those fears and uncertainties to the point where rational decision becomes impossible. (United States v. Westbrook (7th Cir. 1997) 125 F.3d 996, 1005-1006.)

(Lod. Doc. 4 at 25 ).

Petitioner has not met his burden of establishing that the Court of Appeal's factual determination, that Petitioner was not given any promises of leniency in exchange for an inculpatory statement, was incorrect. Petitioner contends merely that a promise was "implied." (Pet. at 16). On this record, the Court cannot disturb the state court's finding that law enforcement officers did not make any promises to Petitioner.

**C. Totality of the Circumstances**

The California Court of Appeal concluded that the totality of the circumstances did not support Petitioner's contention that either his May 2 or May 5 confessions were involuntary.[5] The California Court of Appeal identified the appropriate legal standard and made factual findings that are supported by the evidence.[6] Based on the record, the Court cannot say that the California Court of Appeal's finding that Petitioner's May 2 and May 5 confessions were voluntary was contrary to or an unreasonable application of federal law. The California Court of Appeal's determination was objectively reasonable in light of the facts presented before the state courts. Accordingly, Petitioner is not entitled to relief. E.g., Lockyer, 538 U.S. at 75.

---

[5] Because Petitioner failed to establish coercion with respect to his May 2 confession, his claim that his May 5 confession was tainted by coercive tactics employed on May 2 necessarily fails.

[6] The California Court of Appeal stated, "[t]he federal Constitution requires the prosecution to establish, by a preponderance of the evidence, that a defendant's confession was voluntary...[u]nder both state and federal law, courts apply a totality of circumstances test to determine the voluntariness of a confession. ..In determining whether a confession was voluntary, the question is whether defendant's choice to confess was not essentially free because his will was overborne. (Lod. Doc. 4 at 24)

**IV.    Certificate of Appealability**

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 123 S.Ct. 1029, 1039 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253.

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 123 S.Ct. at 1034; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 123 S.Ct. at 1040.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial

showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. The Petition for Writ of Habeas Corpus is DENIED with prejudice;

4. The Clerk of Court is DIRECTED to enter judgment; and

5. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

**Dated:    June 24, 2009**                           /s/ John M. Dixon
                                                                    UNITED STATES MAGISTRATE JUDGE